IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 20, 2002 Session

**STATE OF TENNESSEE v. DAVID WAYNE SMART**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-A-162     J. Randall Wyatt, Jr., Judge**

---

**No. M2001-02881-CCA-R3-CD - Filed May 13, 2003**

---

The defendant was convicted of first degree premeditated murder and sentenced to life imprisonment. In addition to challenging the sufficiency of the evidence, he argues the trial court erred in excluding testimony as to the victim's prior aggressive conduct, as well as his access and familiarity with firearms, and in not instructing as to aggravated assault as a lesser-included offense and that the cumulative effect of these errors warrants a new trial. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JOE G. RILEY, JJ., joined.

Jodie A. Bell (on appeal) and Glenn R. Funk (at trial and on appeal), Nashville, Tennessee, for the appellant, David Wayne Smart.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm and Philip H. Wehby, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant, David Wayne Smart, was charged by a Davidson County Grand Jury with first degree premeditated murder for the September 27, 2000, shooting death of the victim, Gabriel Jeans, at a Phillips 66 gasoline station and convenience store on Briley Parkway in Nashville. The proof at his September 24-27, 2001, trial established that the defendant was paying for a purchase at the store when the victim, an acquaintance the defendant asserted had robbed him the previous week at his home, entered the store, made eye contact with the defendant, and walked to the water fountain. The defendant told the store cashier that the victim had robbed him earlier and stated that he, rather than the victim, would be going to jail. He then left the store, went home, retrieved his gun, returned and confronted the unarmed victim, demanding that he return his money. When the

victim refused, the defendant shot him four times, killing him with a gunshot wound to the chest. At trial, the defendant claimed that he retrieved his gun only because he was afraid of the victim and feared he was armed, and that he never intended to kill the victim but shot the victim in self-defense when the victim advanced on him in a menacing manner. At the conclusion of the trial, the jury rejected the defendant's claim of self-defense, finding him guilty of first degree premeditated murder. Because the State did not seek either the death penalty or a life sentence without the possibility of parole, the defendant was automatically sentenced by the trial court to life imprisonment.

Following the trial court's denial of his motion for a new trial, the defendant filed a timely appeal as of right to this court, raising the following issues:

I. Is the evidence contained in the record sufficient to support a finding by a rational trier of fact that the defendant is guilty of premeditated first degree murder beyond a reasonable doubt?

II. Did the trial court err in refusing to admit testimony regarding prior aggressive conduct of the decedent where self-defense was at issue?

III. Was there a basis for admitting testimony regarding the decedent's prior familiarity and access to stolen weapons when the defendant testified that he believed the decedent might be armed?

IV. Under State v. Burns, 6 S.W.3d 453 (Tenn. 1999), should the jury have been instructed on aggravated assault as a lesser offense of first degree murder?

V. In light of comments made by the State that it was not seeking the death penalty, should the trial court have informed the jury that a defendant convicted of first degree murder is not eligible for parole until he has served fifty-one calendar years?

VI. Do the trial court's cumulative errors warrant a new trial?

## FACTS

### State's Proof

The State's first witness was Lanell Merchant, who was working as a cashier at the Phillips 66 store at the time the shooting occurred. She testified the defendant pulled into the gasoline station between 5:15 and 5:30 p.m. on September 27, 2000, to purchase gasoline for his taxicab. As he was paying for his purchase inside the store, the victim entered and the two men made eye contact but

did not speak. The victim then walked across the store to the water fountain. Although the defendant continued his transaction at the cash register, he kept looking over at the victim and appeared to be upset, prompting Merchant to ask him what was wrong. She described the scene and the explanation the defendant provided for his behavior:

> When [the victim] was getting a drink of water, [the defendant] seemed a little tense. And I had asked him if he was okay. And he just kept looking. And he said, "That boy robbed me," and I guess I kind of glanced over. And I said, "Just now?" And he said, "No. It was a while back."
>
> . . . .
>
> And I said, "Well, did he go to jail for it?" And he said, "No, but I am." He said, "I'll be right back."

Merchant testified the defendant completed his purchase, exited the store, and drove off in his taxicab. After he left, the victim asked what the defendant had just said to her, and she and the victim engaged in a short conversation until her attention was claimed by other customers. Merchant revealed the substance of that conversation on cross-examination, testifying that she told the victim that the defendant had said something about the victim's having robbed him, to which the victim replied, "[Y]eah, I robbed him, but he robbed me first."

A short while later, Merchant looked up and saw the defendant enter the store again and confront the victim, saying, "Give me all of your money. I want everything on you." Merchant testified the victim responded by walking over to the defendant and saying, "No, you're not getting anything." At that point, the defendant reached into his back pocket. The victim said, "Don't pull that gun out of your pocket," but the defendant pulled out a small silver gun that "looked like a fake gun," pointed it at the victim, and shot him. Merchant was aware of the defendant's having fired a total of four shots at the victim before leaving the store and driving off in his pickup truck, which was parked outside. She said the first shot caused the victim to fall to the floor on the front side of the counter, where the defendant was standing. The victim attempted to escape by first "trying to scoot away from [the defendant]" and then by jumping over the counter to the other side. The defendant continued to shoot at him during this time, firing his second shot as the victim was lying on the floor in front of the counter and his fourth shot after the victim had tumbled to the floor behind the counter. Merchant said she did not see the third shot, but was within three or four feet of the victim when the fourth and final shot was fired. After the defendant left, she locked the door and gathered towels to hold against the victim's wounds, while her coworker and a store customer telephoned for an ambulance and police.

A videotape of the incident, which Merchant identified as having been recorded by the store's surveillance camera, was played at various speeds before the jury and introduced as an exhibit in the case. Merchant agreed the videotape reflected that, contrary to what she had reported in her initial

statements to police, only two minutes elapsed from the time the defendant left the store until he returned to shoot the victim, and he did not appear to have changed clothes during the interim. She testified she did not hear the victim threaten the defendant or see the victim with a gun or make any movement as if to reach for a gun.

On cross-examination, Merchant acknowledged she had been so severely traumatized by the incident that she had never returned to work at the store. She conceded she had been mistaken in several of the details she had provided in her initial statement to police and in her testimony at the preliminary hearing, but maintained her memory of what the defendant said to her before leaving the store the first time, as well as the words the defendant and victim exchanged just prior to the shooting, was accurate. She acknowledged the defendant did not have a gun in his hand when he returned to the store to confront the victim, but her testimony at the preliminary hearing had been that, as the defendant was demanding the victim's money, the victim "stepped up to him, as in bowing up, as if he was angry." She explained that by "bowing up" she meant that the victim got close to the defendant. Merchant acknowledged having told the police that the defendant's hand was shaking as he reached for his gun and that he almost dropped the weapon. She testified the defendant was angry and explained that she shook when she was angry, too. However, she conceded she had not said anything about the defendant's having been angry in her statement to the police, and agreed that fear and nervousness could also cause a person to shake. The victim, according to Merchant, was "definitely heavier and stronger" than the defendant.

Richard Taylor testified he had been working at the Phillips 66 store for approximately three months and was on duty inside the store at the time the shooting occurred. He said he was familiar with both the defendant and the victim as regular customers of the store. On the day of the shooting, he saw the defendant arrive in a green, checkered taxicab van. The victim entered the store after the defendant was inside, and the two exchanged a "definite stare for a few moments." Nothing happened at that point, and the defendant left the store.

Taylor testified that when the defendant returned, he first looked in the door of the store "to see if [the victim] was still in there" and then went back to his pickup truck, where he retrieved what Taylor assumed was his gun, before coming back inside the store. Taylor described exactly what he witnessed: "I seen [sic] [the defendant] go to his truck, open the driver's door, pull out something silver, and put it in his back pocket. And at that time, [the victim] said, 'Don't let him bring that gun in the store.'" Taylor said the defendant told the victim after entering the store, "Give me all your money," to which the victim responded, "No. And don't pull that gun out." Next, the defendant "pulled the gun out and shot [the victim]." Taylor testified he heard a total of "[t]hree or four" shots, and corroborated Merchant's testimony that the victim appeared to be trying to escape from the defendant as the successive shots were fired. Taylor said that, in the victim's efforts to get away from the defendant, the victim went first to the corner of the store where the fountain drinks were and then jumped over the back counter, landing approximately six to eight feet from where the first shot had been fired. Taylor did not hear the victim threaten the defendant, did not see him with a gun, and did not see him make any motions as if to reach for a weapon.

Taylor acknowledged on cross-examination that he did not hear Merchant's conversations with the defendant or the victim and that, although he saw the defendant retrieve a silver object from his truck, he did not actually see that it was a gun. He testified the defendant was not holding the gun when he entered the store and did not pull it out until after the victim had already approached and was standing face-to-face with him.

Isabel Davis testified she stopped by the Phillips 66 store at about 5:20 p.m. on September 27, 2000, to make a purchase. She was aware of some sort of commotion between the defendant and the victim but did not pay much attention, believing they were "just kind of joking around or fighting." Davis heard what she thought were gunshots as she was walking out of the store, but immediately "disregarded it, because it was not loud at all." However, when she turned around and saw the defendant run out of the store, she realized the situation was serious and called 9-1-1. She heard a total of four or five gunshots and saw the defendant holding a small, silver revolver, but did not actually see him fire the shots. She did not see or hear the victim threaten the defendant in any way. She thought the victim "seemed more afraid" of the defendant than menacing, based on what she heard him say to the defendant, which was "[s]omething in the nature of don't bring that gun in here, man, don't bring this gun in here."

On cross-examination, Davis acknowledged having told police that the defendant grabbed the victim's shirt while she was in the store. She recalled having heard the defendant and the victim engaging in "street talk" while she was still inside, and said "they somehow rammed each other, or something like that" as she was walking out the door. She could not remember if any profanity was used or what specifically was said, other than the victim's telling the defendant not to bring his gun into the store. She agreed she had described the defendant to police as short and skinny, and that the victim was a larger man.

The autopsy of the victim's body was performed by Dr. Bruce Phillip Levy, the chief medical examiner for Davidson County. Dr. Levy testified he found a total of four gunshot wounds to the victim's body: a fatal gunshot wound to the center of the victim's chest, which struck the heart and right lung and caused him to bleed to death; a nonfatal, "very superficial wound" across the front of his right knee; and two nonfatal gunshot wounds to his left thigh area. He stated that someone with the type of gunshot wound to the heart and lung suffered by the victim would not die immediately and would "be able to remain conscious for a short period of time" before being rendered unconscious by the loss of blood. Dr. Levy testified the toxicology report on the twenty-one-year-old, 185 pound, 5' 9" victim showed the presence of "metabolites of both cocaine and marihuana" in his urine, but no drugs or alcohol in his blood. He explained these findings meant that the victim had used both marijuana and cocaine within a day or two of his death but had not been actively under the influence of the drugs at the time he was killed. Finally, he testified there was no evidence of "close or intermediate range fire," which meant that the gunshots had been fired from a distance of greater than twenty-four inches from the victim's body.

Detective Joe Williams of the Metro Police Department, the lead investigator assigned to the shooting, testified that a total of four shots were fired at the store. Interviews conducted of the

witnesses at the scene led to the defendant being developed as a suspect in the shooting. In his attempts to locate the defendant, Detective Williams sent officers to the defendant's residence, approximately a block and a half from the store, and contacted the defendant's employer. Although the defendant was not at home, officers found his tan Ford Ranger pickup truck at his house. The defendant's Checker taxicab van was later found abandoned behind a warehouse approximately three to five miles from the store. Detective Williams testified he spoke with the defendant by telephone at about 1:30 or 2:00 a.m. the next day, the defendant's employer having provided him with the defendant's cell phone number. Subsequently, at about 5:30 a.m., the defendant turned himself in, arriving at the police station with his .25 caliber semi-automatic handgun, which he turned over to police.

Detective Williams testified the store's surveillance tape revealed the following chronology of events: The defendant entered the store at 5:18:46; the victim entered the store at 5:20:52; the defendant exited the store at 5:21:35, pulled back into the station at 5:23:26, opened the door and looked in the store at 5:23:37, came back and entered the store at 5:23:51, confronted the victim at 5:23:54, pulled his gun from his pocket and fired his first shot at 5:23:59, fired his last shot at 5:24:24, and exited the store at 5:24:28. Detective Williams acknowledged on cross-examination that, to his knowledge, the only arrest or conviction the defendant had on his record was for driving on a suspended license in the 1980s.

**Defense Proof**

The defendant testified he was thirty-four years old, weighed 120 pounds, and, except for driving on a suspended license in the 1980s, had never before been in trouble. He said he was a nonviolent, peaceful man and had not been in a fight since elementary school. After graduating from high school in 1985, he had served in the Navy before attending ITT Technical Institute, from which he had received an associate's degree in Electronic Engineering Technologies. Although he had at first worked in the electronics field, he had become burned out and, about five or six months prior to the September shooting, had begun driving a taxicab to earn his living.

The defendant testified he had moved in either 1992 or 1993 to a house located approximately fifty to seventy-five yards from the Phillips 66 market, where he still lived at the time of the shooting. The victim lived in the same neighborhood and, according to the defendant, was known by everyone as "the terror of the neighborhood." The defendant testified he knew the victim carried a weapon because he had once shown it to him. He also knew of the victim's having committed several violent acts in the past, including threatening the life of an eleven-year-old child as he held his gun to the back of the child's head, threatening the life of the mother of the child, beating up the mother of the child, and robbing, threatening, and breaking into the homes of several men. The defendant testified he himself had had two frightening encounters with the victim in the days leading up to September 27. The first occurred about a month before the shooting when the victim knocked on his door and told him he needed $30 to bail his mother out of jail. The defendant said he initially told the victim he did not have any money, but ultimately gave him the $28 he had

in his wallet because the victim "had started to act like he was going to force his way in," telling the defendant to give him whatever money he had.

The defendant testified his second frightening experience occurred about a week before the shooting. According to his account, he was home alone expecting a friend to arrive momentarily when he heard a knock at his door. Thinking it was his friend, he called out "come in" and the victim walked into his living room with a "Game Boy," which he tried to persuade the defendant to buy. The defendant said he told the victim he did not want the game, but the victim became increasingly more persistent that he buy it, which made the defendant "nervous." He testified he did not want a confrontation with the victim and implied he was afraid to ask him to leave his home. Therefore, he called his friend to ask how soon he could arrive, hoping that once he did so, the victim would leave. However, as he hung up the telephone, the victim stood up in front of him, grabbed his arm, knocked him down, grabbed approximately $200 that the defendant had in an ashtray, and ran out the door.

The defendant testified that the first time he saw the victim after the robbery was on the afternoon of September 27, when the victim walked past him in the Phillips 66 store as he was paying for his gas and then turned around and gave him "a real mean look," which he interpreted to mean that the victim was going to "get" him. The victim did not, however, say anything to him at that time. The defendant testified he kept looking over at the victim to make sure he was not about to come after him and, at the same time, tried to "hurry up and get out" of the store, with his "number one goal" being "to run, to flee." He remembered telling the cashier that the victim had robbed him, but had no memory of the other conversation the cashier reported, that is, that he had responded to her question of whether the victim had gone to jail for the robbery with the words, "No, but I am." The defendant stated he had no intention of returning to the store when he left after paying for his purchase and that the exchange the cashier reported was not the kind of statement he would ordinarily make.

The defendant testified he did not feel safe when he reached home, however. He "just . . . knew" that the victim, realizing he had just gotten off work and had money, would follow him to his house to "either rob . . . or hurt" him. He therefore decided to return to the store to confront the victim in public, where he felt safer. The defendant explained:

> I felt like that my choices were limited. I couldn't -- I couldn't stay there and wait for him to come back, because that would definitely be a violent situation. So I thought that if I confronted him in public, if I could catch him while he was still up there, in public, that I could keep him from coming to my house again and that he wouldn't rob me.

The defendant insisted his intention in returning to the store was simply to get back the money the victim had stolen from him. However, because he knew the victim's reputation for violence and his propensity for carrying a weapon, he decided to take a gun with him for protection

-7-

when he confronted the victim. The defendant testified he owned both a .25 caliber gun and a larger, more powerful "Tech Nine," and that he chose to take the smaller gun because he did not plan on using his weapon. He said he placed the gun in his left rear pocket, although he was right-handed, because his wallet was in his right rear pocket. He then got into his truck and drove back to the store.

The defendant testified he got out of his truck when he arrived at the store, walked to the door, and peeked inside to see if the victim was still there. Although the videotape shows he looked in the direction of the victim, the defendant claimed he did not see him and therefore went back outside and walked to the end of the building to see if the victim was already headed to his house. He denied he went to his truck to get his gun, testifying that it was already in his back pocket. He stated that when he did not see the victim outside, he returned to the store to ask the cashier if she knew where the victim had gone. Inside the store, however, he immediately saw the victim and, with his gun still in his back pocket, walked toward the victim and asked for the return of his money.

According to the defendant, the victim responded by becoming very angry and "coming at [him] like a charging . . . bull," yelling, "[M]other fucker, you going to come in here and start talking shit? Who do you think you are, mother fucker?" The defendant testified he was "shocked" and ceased walking toward the victim, stopping "[p]robably eight to ten feet" from him. He said that the victim kept coming at him, however, and, when he was "right up in [his] face," said, "I suggest you pull that gun out of your pocket." The defendant said that the manner in which the victim spoke indicated to him that the victim was letting him know he knew the defendant had a gun, and that he was either going to pull his own gun or try to take the defendant's. He testified that he was "scared to death" because he believed in that instant that the victim was going to kill him. Therefore, he reached into his back pocket with his left hand, pulled his own gun out, switched the weapon to his right hand, took a step back, and fired at the victim. The defendant said he was shaking so badly with fear that he almost dropped the weapon as he switched it from his left to his right hand. He testified that the victim backed up after he fired the first shot, and he then fired a "couple of more shots at his legs, just to keep him back so [he] could get out the door." The defendant acknowledged he went toward the victim as he fired these latter shots, but explained it was because he still believed the victim had a gun and feared he would pull it out and shoot him. He said he turned around and fired his last shot as he was going out the door because he thought the noise the victim made as he was jumping over the counter was the sound of the victim coming after him.

The defendant adamantly denied he ever had the intent to kill the victim. He said he fired the first shot because he was afraid for his life and was trying to keep the victim from getting his gun, and testified that "[o]nce the first shot went off, it was over – emotions overwhelmed me. It was like something that he had made me do." The defendant went on to testify, however, that he fired the successive shots "[j]ust so [he] could get out" of the store. He said he deliberately fired shots two, three and four at the victim's legs, and that he did not know the victim was dead when he left the store.

At defense counsel's request, the defendant reviewed and narrated copies of the surveillance videotape, subsequently admitted as exhibits, which showed the action both in "real-time," as opposed to the fast-motion recorded by the store's surveillance tape, and in slow motion.[1] He described the pertinent scene as follows:

> A    When I come back in, I ask him for my money, right there.
>
> Q    That's what that movement is with your right hand, I want my money back?
>
> A    Right. And then I take three steps and I stop. He comes at me. And as he's coming at me, he's cussing me. He says, I suggest you take that gun out of your pocket. And I reach back with my left hand and swap it over to my right. As I swap it over, I almost dropped it. And then I fired.

The defendant also identified a series of still photographs made from one of the videotapes, subsequently admitted as a collective exhibit in the case, which show that a six-second interval elapsed during which he stood still as the victim approached him in the store. He said he was not angry when he shot the victim, was not intending to get revenge for his earlier robbery, and did not intend to kill the victim.

The defendant testified on cross-examination that he characterized the victim's walking toward him as "coming at [him]" because the victim had a "bad attitude, an attitude like he's getting ready to fight." He admitted, however, that the victim did not threaten to kill or hit him, did not have a gun, never touched him, never raised his hands toward him or made any motions to reach for a gun, and had his hands down at his side when the defendant shot him. He denied that the victim fell to the floor after the first shot and maintained that he had deliberately aimed his successive shots at the victim's legs, despite the videotape showing that his last shot appeared to have been somewhat randomly and carelessly fired in the direction of the victim when he turned around before going out the door. He also insisted that the victim was still coming toward him at the time he fired his first shot, in spite of the videotape which shows that the victim had stopped. The defendant acknowledged his nine-millimeter "Tech Nine" would not have fit into his back pocket, but insisted

---

[1]The plastic cartridges on these two videotapes were broken when they arrived at this court, having apparently been damaged in transit. Consequently, neither of these tapes was viewable. We have, however, repeatedly and thoroughly reviewed the original surveillance tape of the incident, playing it both at the speed at which it was recorded and in slow motion as we advanced the tape frame by frame. Thus, we have been able to carefully analyze the sequence of events and the respective positions of the defendant and the victim before, during, and after the initial gunshot was fired. We have also reviewed the still photographs made from the videotape, which show the relative positions of the victim and the defendant during the seconds immediately preceding the shooting. We are therefore confident that the damaged videotapes would have made no difference to the outcome of this case. In this regard, we note that when moving that the tapes be admitted as exhibits, defense counsel acknowledged they might be duplicative of the original tape that had already been admitted as an exhibit.

that fact played no part in his decision to take his smaller caliber weapon with him to the store. He explained he had not called the police to report the victim's robbery at his home because he feared the victim's reaction. He said he went home after the shooting and then drove his taxicab to the workplace of a friend, who in turn drove him to the home of his brother, Donnie Smart, in Murfreesboro. He testified he was emotionally distraught after the shooting and denied he had been attempting to hide from the police.

Donnie Brooks testified he had been friends with the defendant for six or seven years and knew him to be a very peaceful, nonviolent man. According to his testimony, the defendant showed up in his taxicab at his workplace shortly after the incident, wanting Brooks to take him to turn himself in. Brooks said the defendant appeared to be in a state of shock, had difficulty talking, and was unable to clearly tell his story in a telephone call he made to his brother in Brooks's presence, handing the telephone to Brooks to complete the call. After telling the defendant's brother that he would bring the defendant to him, Brooks drove the defendant to Murfreesboro in his vehicle, leaving the taxicab at Brooks's workplace.

The defendant's brother, Donnie Smart, also described the defendant as peaceful and nonviolent and testified that he knew the defendant was scared and intimidated by the victim in the week preceding the shooting. He corroborated Brooks's testimony that the defendant had been so emotionally distraught when he telephoned him at about 6:00 the evening of the shooting that he was unable to complete his conversation and had to turn the telephone over to Brooks. He testified that at approximately 6:30 p.m., the defendant and Brooks arrived at his Murfreesboro home, where they discussed what had occurred. He said the defendant "was destroyed," crying and saying he was sorry, when he learned from the 9:00 p.m. news that the victim had died. At 4:00 the next morning, he went with the defendant to the police station to turn himself in.

Checker Cab Company owner Larry Tidwell testified the defendant had worked as a cabdriver for his company for approximately five or six months at the time of the shooting. He said the defendant told him he was afraid to work at night and, as a consequence, worked daytime hours, primarily running airport trips, which, according to Tidwell, is the safest duty a cabdriver can have. Tidwell said that, before this incident occurred, he had never known the defendant to be violent. On cross-examination, he testified he spoke with the defendant by cell phone on the night of the shooting, and confirmed having told police that the defendant told him in that conversation that he had shot the victim twice, in the stomach and leg, and had shot at him again after he fell to the ground and "balled up," but did not know if he had hit him with those shots.

Antonio Caruthers, the defendant's next-door neighbor, testified he had known the defendant for a number of years and believed him to be a peaceful, nonviolent man. He said that about a week before the shooting, he was in his driveway when he saw a man he did not recognize run out of the defendant's house and down the road. A few seconds later, the defendant ran out of his house, yelling something to the effect, "[S]top him, he just robbed me." Caruthers testified he did not know the victim.

The defendant's final four witnesses, John Turnbo, Jane Spear, Teresa Davis, and Tim Wilson, all testified to the victim's reputation in the community for violence. Turnbo testified the victim was "very violent." He said on July 9, 1997, the victim jumped the fence at his house, vandalized his truck, threatened his life, and assaulted his then girlfriend. He acknowledged he did not see the assault, but said the victim and his girlfriend were the only ones outside the house at the time, that he heard the victim from his position inside the house, and that he saw bruises on his girlfriend's face after the victim left, which had not been there before he arrived. Spear testified she had known the victim for a number of years and had heard that he was "a very violent young man." Davis testified the victim's reputation in the community was that he "could be violent on occasion." She said when the victim was about fourteen, he put a gun to the head of her then eleven-year-old son, but she did not witness the incident. Finally, Wilson testified that the victim was known in the community as a violent person and that he knew of the victim's having beaten up two neighborhood children. In his opinion, the victim "kind of terrorized the neighborhood," but he had never heard anything bad about the defendant.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first challenges the sufficiency of the evidence in support of his first degree murder conviction. He argues that the State failed to prove premeditation beyond a reasonable doubt and asserts that the evidence at most supports a conviction for second degree murder. The State contends the defendant's words and actions clearly demonstrated premeditation, and the evidence, therefore, was sufficient for a rational trier of fact to find him guilty of first degree murder beyond a reasonable doubt.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt.").

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

-11-

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1998). Premeditation is defined as

> an act done after the existence of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (Supp. 1998).

In Tennessee, once a homicide is established it is presumed to be second degree murder and the State bears the burden of proving the element of premeditation to elevate the offense to first degree murder. See State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Whether premeditation exists is a question for the jury to determine based on the evidence, and may be established by the defendant's conduct and the circumstances surrounding the killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Facts from which premeditation may be inferred include evidence of a motive for the killing, evidence that the defendant procured a weapon, use of a deadly weapon upon an unarmed victim, and evidence that the victim was retreating or attempting to escape when killed. See State v. Dellinger, 79 S.W.3d 458, 492 (Tenn.), cert. denied, __ U.S. __, 123 S. Ct. 695, 154 L. Ed. 2d 635 (2002); Bland, 958 S.W.2d at 660; State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 2000).

Viewed in the light most favorable to the State, a reasonable jury could have found that the defendant's killing of the victim was premeditated. After seeing the victim enter the store, the defendant told store cashier Lanell Merchant that the victim had robbed him earlier and, in response to her query of whether the victim had gone to jail, replied, "No, but I am," and that he would be right back. The defendant then drove home in his taxicab, retrieved his gun, and returned in his pickup truck less than two minutes later. Upon the defendant's return to the store, employee Richard Taylor saw him open the door, look inside in the direction of the victim, go back out to his truck, remove a silver object that appeared to be a gun, and put it in his rear pocket. Taylor and Merchant next saw the defendant come back inside the store and confront the victim by demanding his money. When the victim refused and walked toward him, the defendant pulled his gun out of his pocket, took a step back, and fired directly into the victim's chest. The victim fell back and the defendant followed, firing two more shots as the victim was attempting to escape by "scooting away" from him and jumping over the counter and a final shot as he was on his way out of the store, after the victim had already tumbled to the floor behind the counter. The defendant then fled the scene, switching vehicles twice and abandoning his pickup truck at his home and his taxicab at his friend's workplace, before eventually ending up at his brother's home in Murfreesboro. He turned himself in to police the next morning, but only after he had already been contacted by police via his cell phone.

It was undisputed that the victim was unarmed. Neither Merchant nor Taylor heard him threaten the defendant, and neither saw him make any threatening motions. Immediately before the shooting, Taylor heard the victim say something about not letting the defendant bring his gun into the store. Isabel Davis, a customer who was exiting the store as the gunshots were fired, also heard the victim say something to the defendant about not bringing his gun into the store and testified that the victim appeared to be afraid of the defendant. All of these facts and circumstances support the jury's rejection of the defendant's claim of self-defense and its finding that his killing of the victim was intentional and premeditated.

The defendant argues, nonetheless, that the evidence before the jury "established that the shooting was a spontaneous, unpremeditated response to [the victim's] aggressive stance following the defendant's demand that [the victim] return the stolen money." In support, he cites, *inter alia*: the videotape of the shooting, showing that the victim walked up to him in an aggressive manner and stood face-to-face with him before he pulled his gun out of his pocket and shot him; his testimony that he retrieved his gun to use in self-defense only because he believed the victim might be armed; testimony by neighborhood residents of the victim's reputation for violence; and evidence that he was emotionally distraught after the killing and turned himself in to police early the next morning. As for the repeated shots he fired at the victim, the defendant cites State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992), to argue that they were fired in the heat of passion and are therefore not alone sufficient to show premeditation.

However, the jury heard and saw the evidence cited by the defendant, including the store surveillance videotape of the shooting, which contains nothing to contradict the jury's rejection of the defendant's claim of self-defense or its finding that the shooting was the result of premeditation, rather than a spontaneous act. The videotape has no sound, and it is impossible to distinguish the

facial expressions of the parties.  However, the actions of the defendant and the victim, as well as their relative positions to each other prior to the shooting, can clearly be seen.  The videotape shows the victim leaning against the front counter watching Merchant's transaction with Isabel Davis at the time the defendant returned to the store.  The defendant briefly opened the door and looked in the direction of the victim, who remained lounging against the counter.  The defendant then stepped back outside and disappeared from the camera's view.  Next, he opened the door again, entered the store, and took four strides toward the victim.  At that point, the victim straightened up from the counter and began walking toward the defendant.  The defendant stopped and the victim continued to advance, halting immediately in front of the defendant, with his face within inches of the defendant's face.  Although the victim's posture appeared confrontational as he stood face-to-face with the defendant, his hands remained down at his side and he did not touch the defendant as the defendant pulled his gun out of his pocket, took a step backwards, and fired.  The victim fell backwards and out of camera view to the left of the screen. The defendant followed and fired at least two more shots in the direction in which the victim disappeared from camera view, before he briefly disappeared from camera view himself.  He then reappeared and started to the door.  Before exiting, however, he turned and fired one final shot in the direction of the victim.

In sum, there was ample circumstantial evidence in this case from which the jury could infer premeditation, including: the defendant's prior relationship with the victim and motive for the murder; the fact that he went home to get his gun and, upon his return, checked to see if the victim was still inside the store before retrieving the weapon from his truck; his use of a deadly weapon upon the unarmed victim; his continuing to shoot at the victim as the victim attempted to escape; and the fact that he fled the scene immediately after the shooting.  Therefore, after viewing the evidence in the light most favorable to the State, we conclude that it was sufficient for a rational trier of fact to find the defendant guilty of first degree premeditated murder beyond a reasonable doubt.

## II.  Evidence of Victim's Prior Act of Violence

As his second issue, the defendant contends that the trial court erred in limiting defense witness Jane Spear's testimony to her knowledge of the victim's reputation in the community for violence.  Defense counsel sought, instead, to have her testify regarding a specific threat the victim had made against her daughter.  In a conference held in chambers, defense counsel explained to the trial court what he anticipated her testimony would be:

> [DEFENSE COUNSEL]: My questions are, first of all, did you know [the victim's] reputation in the community?  Yes.  I knew he was a violent man.  Okay.  Then I'm going to say, were you present when [the victim] came over to your house threatening to do violence to your daughter.  She'll say, yes, I saw him come in.  I told my daughter to stay in the house.  And I got him to leave.
>
> [THE STATE]:  Well, Judge, how could she testify he came over –

-14-

THE COURT:  Look –

[DEFENSE COUNSEL]:  The threat had come in over the telephone.

THE COURT:  To her?

[THE STATE]:  To her?

[DEFENSE COUNSEL]:  It was to her daughter.  And I don't know that she can say it was [the victim].

THE COURT:  I think [sic] you can be a violent person, if you don't do that.  If they don't even know it was him.  It wasn't even her answering the phone.

[DEFENSE COUNSEL]:  That's fine.

The defendant argues that Spear "should have been allowed to testify about [the victim's] aggressive behavior at her home in order to corroborate the defendant's claim that [the victim] was the first aggressor."  The State first questions whether the evidence fairly raised the issue of self-defense, although it concedes the trial court instructed the jury on self-defense and the State did not raise the issue at trial.  The State next argues that the defendant waived the issue by his failure to either object to the trial court's ruling or make a proffer of the witness's testimony.  Finally, the State argues that the trial court appropriately refused to allow the witness to testify about a threat of which she obviously had no firsthand knowledge.

If the issue of first aggressor has first been raised by the evidence, proof of the victim's prior violent acts may be admissible through the direct examination of a witness for the purpose of corroborating the defendant's claim of self-defense.  See State v. Ruane, 912 S.W.2d 766, 780 (Tenn. Crim. App. 1995); see also Neil P. Cohen et al., Tennessee Law of Evidence, § 4.04[5][d] (4th ed. 2000).  Before admitting the evidence, however, the trial court must determine if there is a factual basis underlying the proffered testimony and whether its probative value outweighs its prejudicial effect.  Ruane, 912 S.W.2d at 781.  The decision to admit or exclude evidence is generally left to the sound discretion of the trial court, and, as such, will not be disturbed on review absent a showing of an abuse of discretion.  State v. James, 81 S.W.3d 751, 760 (Tenn. 2002).

Here, defense counsel merely informed the trial court of what he anticipated Spear's testimony would entail, rather than requesting a jury-out hearing at which to make a proffer of her testimony.  Since the proposed testimony is not in the record, the defendant has waived this issue for appellate review.  See State v. Goad, 707 S.W.2d 846, 853 (Tenn. 1986) (When excluded evidence "consists of oral testimony, it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible.").  Regardless of the waiver, we conclude that the trial court did not abuse its discretion in its ruling on this matter.  At the

conference in chambers, defense counsel conceded that the victim's alleged threat had been made by telephone to Spear's daughter. Moreover, although the defendant argues on appeal that Spear should have been allowed to testify about the victim's "aggressive behavior at her home," defense counsel did not tell the trial court of any violent behavior on the part of the victim that Spear had witnessed, which he presumably would have done had it occurred. Under these circumstances, the trial court properly excluded the testimony.

### III. Evidence of Victim's Prior Access and Familiarity with Stolen Weapons

The defendant next contends the trial court erred in prohibiting a witness from testifying about the victim's connection with stolen weapons. Following the testimony of Donnie Brooks, defense counsel sought to present the testimony of Fred Overstreet, who, counsel said, would testify that the victim had taken several guns from Overstreet's parents during a burglary of their home some five or six years prior to the defendant's trial. After ascertaining that Overstreet had not informed the defendant of the burglary, the trial court ruled the evidence inadmissible. Defense counsel then requested and received permission to make a proffer of Overstreet's testimony. In the jury-out hearing that followed, Overstreet testified that several guns were taken in a 1994 burglary of his parents' home, but he had no knowledge of who had taken them. He said the victim had told him he knew who had the guns and had helped to recover them, but had never admitted to participating in the burglary. Overstreet had no knowledge of whether the victim had been prosecuted in juvenile court for the crime, testifying, "That was my mom and dad." He said he did not know the defendant.

At the conclusion of Overstreet's proffered testimony, the trial court made the following ruling:

> All right. After hearing him, that's even further removed than I was at least willing to consider. And I don't think that that needs to go before the Jury at all. It doesn't even necessarily implicate the victim as being the one who actually stole the guns. And the only thing I heard from that is that he helped to recover the guns and then something happened in Juvenile Court where he had some receiving or concealing or whatever kind of case it was.

We find no abuse of discretion in the trial court's ruling. The defendant argues Overstreet's testimony was relevant and admissible to reinforce the reasonableness of his belief the victim was armed and to corroborate his claim that the victim was the first aggressor. However, as the State points out, there was no proof that the defendant knew of the victim's alleged theft or connection with the stolen weapons; thus, the testimony was not admissible to show the defendant's state of mind. See Tennessee Law of Evidence § 4.04[5][b]. Similarly, the testimony was not admissible to corroborate the defendant's claim of first aggressor because there was no proof that the burglary, even assuming the victim was involved, was a violent act. See id. at § 4.04[5][d]. Therefore, the trial court properly excluded this testimony.

## IV. Failure to Instruct on Aggravated Assault as Lesser-Included Offense

The defendant next contends that the trial court committed reversible error by failing to instruct the jury on aggravated assault as a lesser-included offense of first degree premeditated murder. After the jury instructions had been issued, the defendant requested that the trial court instruct the jury on aggravated assault, arguing that under the facts of the case, the jury could determine that the first fatal shot to the victim's chest was fired in self-defense and that the successive, nonfatal shots to the victim's legs amounted to the offense of aggravated assault. The trial court refused, noting that the shots were all fired within seconds of each other and concluding that an instruction on aggravated assault was not warranted under the facts of the case. We review this issue *de novo*, with no presumption of correctness to the trial court's determination as to which lesser-included offenses to charge. See State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001).

When an issue is raised regarding the trial court's failure to instruct on a lesser-included offense, we must determine: (1) whether the offense is a lesser-included offense under the test adopted in State v. Burns, 6 S.W.3d 453 (Tenn. 1999); (2) whether the evidence supports an instruction on the lesser-included offense; and (3) whether the failure to instruct on the lesser-included offense constitutes harmless error. State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002).

The State argues that aggravated assault is not a lesser-included offense of first degree premeditated murder under the Burns test because all of its statutory elements are not included in the elements of first degree premeditated murder, as required by part (a) of the test, and it does not satisfy either part (b) or (c) of the test. Alternatively, the State cites State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998), to argue that since the jury convicted the defendant of the indicted offense to the exclusion of the immediately lesser offenses with which it was charged, the trial court's failure to instruct on the more remote lesser offense of aggravated assault amounted to harmless error.

In an opinion released after the briefs were filed in this case, we concluded that an aggravated assault committed by intentionally, knowingly, or recklessly causing serious bodily injury to another is a lesser-included offense of first degree premeditated murder under part (a) of the Burns test. See State v. Paul Graham Manning, No. M2002-00547-CCA-R3-CD, 2003 WL 354510, at *6 (Tenn. Crim. App. Feb. 14, 2003).[2]

However, the defendant is not benefitted even if we apply the holding in Manning that aggravated assault is a lesser-included offense of first degree premeditated murder. First, we note again that the defendant's argument is that since the first fatal shot was fired in self-defense, the trial court erred in not instructing the jury as to aggravated assault and, thus, not giving the jury "the option of convicting the defendant of intentionally shooting [the victim] on a theory that the defendant's intentional, non-justified acts (being shots two, three and four) resulted in injury as

---

[2]An aggravated assault that is based on the use of a deadly weapon, on the other hand, according to Manning, is not a lesser-included offense of first degree premeditated murder because use of a deadly weapon is not one of the elements of first degree premeditated murder. 2003 WL 354510, at *6 n.1.

-17-

opposed to death." However, although the jury was instructed as to the lesser-included offenses of second degree murder, voluntary manslaughter, and reckless homicide, as well as on self-defense, it nonetheless convicted the defendant of first degree premeditated murder, with the evidence uncontested that the defendant's first shot was the only shot which would have been fatal. Thus, by its verdict, the jury rejected the defendant's claim of self-defense. Although the more typical harmless error analysis would be applied to a defendant's claim that a lesser-included offense instruction should have been given because of a fatal shot rather than, as here, because of three subsequent nonfatal shots, we still conclude, as to this issue, that by convicting the defendant of the indicted offense to the exclusion of the immediately lesser offenses with which it was charged, the jury necessarily rejected all other lesser-included offenses. See Allen, 69 S.W.3d at 189 (citing Williams, 977 S.W.2d at 106). Accordingly, we conclude that the trial court did not err in its determination that the jury should not be instructed as to aggravated assault.

### V. Failure To Instruct Jury on Range of Punishment

As his next issue, the defendant contends the trial court committed reversible error by failing to instruct the jury that a defendant sentenced to life must serve a minimum of fifty-one years before becoming eligible for parole. He asserts that the prosecutor commented on range of punishment, in violation of Tennessee Code Annotated section 40-35-201(b), when he said during voir dire that the only time the jury is involved in sentencing is when the death penalty was being sought, which was not the case in the defendant's trial, and when he reassured a venire member who expressed qualms about serving on a capital case that the State was not seeking the death penalty. The defendant contends that the prosecutor's impermissible comments on the death penalty implied that the sentence in his case would be insignificant in comparison, placed capital punishment at issue, and entitled him to an instruction on what a life sentence entailed, as given in those cases in which the jury fixes the sentence. We respectfully disagree.

The comments to which the defendant objects occurred during voir dire, when the prosecutor made the following statement:

> But, in this particular day and age, the law in Tennessee is that the Jury finds the defendant guilty or not guilty. If the Jury finds the defendant guilty, then, at a later time, with information giving [sic] to the Judge at a later time, a Presentence Report is done. The Judge has certain parameters he has to meet to give a sentence on that. The only time that the Jury is involved now in a – in a case is when the death penalty is being sought, which is not the case in this or something like that. That's pretty much the only time that the Jury is involved in the punishment. Do you have a problem with the fact that you'll be assessing guilt or innocence, and if you find the defendant guilty, there's no – you don't, really, get a say-so in the punishment. Do you have a problem with that?

At a later point, the following colloquy occurred between the prosecutor and a venire member:

> [THE STATE]: Okay. And is – I guess this is the first time since – today's Monday, the first day you've, really, gone through this, but, from what I've said and – and the few remarks Judge Wyatt has made, is there anything that, maybe, you think you have a question that's different or anything on your mind about?
>
> JUROR NO. 1: No, just one thing, about the death penalty. I'm opposed to it.
>
> [THE STATE]: We're not asking for the death penalty. This is not a death penalty case.
>
> JUROR NO. 5 [sic]: That's the only thing.
>
> [THE STATE]: If – if it were a death penalty case, there would be a lot more questions about things and –
>
> JUROR NO. 5 [sic]: That was my only concern.
>
> [THE STATE]: Okay.

The record reflects that defense counsel requested at the outset of trial that the jury be instructed on range of punishment, and the trial court refused the request. On the day following the prosecutor's above-quoted remarks, defense counsel renewed his request, arguing that by telling the jury it was not a capital case, the State had impermissibly tried "to minimize the range of punishment," thereby opening the door to the issue and entitling him to an instruction on the number of years a life sentence carries. The trial court again refused his request, stating:

> I don't think he brought that up. I think he answered it in response to a woman over here wanted to know whether she could be on the Jury about the death penalty, that they're not seeking the death penalty. And I don't intend to revisit that. The law's clear and I'm not going to get into the range of punishment. So that will be it.

The law to which the trial court referred, and the code section the defendant cites in his brief, is entitled "Issue of guilt and sentence to be tried separately – Instructing the jury on possible sentences" and provides in pertinent part:

> In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee,

article VI, section 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

Tenn. Code Ann. § 40-35-201(b) (Supp. 2001).

As the trial court noted, the statute makes it clear that a trial court is no longer allowed to instruct the jury on range of punishment in non-capital cases. See also Tenn. Op. Atty. Gen. No. 99-178 (Sept. 17, 1999) ("Further, Tenn. Code Ann. § 40-35-201(b) does not permit instructing the jury regarding the parole eligibility of a defendant convicted of first degree murder and sentenced to life imprisonment under Tenn. Code Ann. § 39-13-208, as such instruction is applicable only for cases proceeding under Tenn. Code Ann. § 39-13-204."). The prosecutor was similarly prohibited by the statute from commenting on the possible penalties the defendant might receive. We disagree with the defendant that the prosecutor's brief comments were a deliberate intent to minimize the punishment the defendant would receive if convicted of the offense, or that the defendant's due process rights to a fair trial required that the trial court then instruct the jury on range of punishment, in violation of the statute. In this regard, we note that this court has previously found it to be harmless error when the trial court, rather than the prosecutor, violated the statute by instructing the jury during voir dire that the State was not seeking the death penalty or life without parole and thus if convicted, the defendant would receive an automatic life sentence. See State v. Charles Ray Allen, No. M1999-00818-CCA-R3-CD, 2000 WL 1649507, at *7 (Tenn. Crim. App. Nov. 3, 2000), perm. to appeal denied (Tenn. 2001). We conclude, likewise, that the prosecutor's more benign remarks in this case, even if error, were harmless, and the trial court did not err in refusing the defendant's range of punishment request.

## VI. Cumulative Errors

As his final issue, the defendant argues that the cumulative effect of the trial court's errors warrants a new trial. Having found no errors committed by the trial court, we respectfully disagree.

## CONCLUSION

Based on the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE